1   STEVEN C. MITCHELL, ESQ., SBN 124644
    ROBERT W. HENKELS, ESQ., SBN 255410
2   GEARY, SHEA, O'DONNELL, GRATTAN & MITCHELL, P.C.
    90 South E Street, Suite 300
3   Santa Rosa, California   95404
    Telephone:  707/545-1660
4   Facsimile:   707/545-1876

5   JAMES V. FITZGERALD, III, SBN 55632
    MCNAMARA, NEY, BEATTY, SLATTERY,
6   BORGES & AMBACHER LLP
    1211 Newell Avenue
7   Walnut Creek, CA 94596
    Telephone: (925) 939-5330
8   Facsimile:     (925) 939-0203

9   Attorneys for Defendants
    ERICK GELHAUS and COUNTY OF SONOMA
10

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13

14  ESTATE OF ANDY LOPEZ, BY AND           CASE NO.:  CV 13 05124 PJH
    THROUGH SUCCESSORS IN INTEREST,
15  RODRIGO LOPEZ AND SUJAY CRUZ, AND
    RODRIGO LOPEZ AND SUJAU CRUZ,
16  INDIVIDUALLY,                          **DEFENDANTS' MOTION FOR
                                           SUMMARY JUDGMENT**
17       Plaintiffs,
                                           Date:  December 9, 2015
18       v.                                Time: 9:00 a.m.
                                           Courtroom: 3
19  ERICK GELHAUS, COUNTY OF SONOMA,
    DOES 1 – 10, INCLUSIVE,
20
         Defendants.
21

22

23                 **NOTICE OF MOTION AND MOTION**

24          PLEASE TAKE NOTICE THAT defendants Deputy Erick Gelhaus and the County of

25  Sonoma ("defendants") shall, and hereby do, move this Court for summary judgment in their favor

26  on **December 9, 2015 at 9:00 a.m.**, before the Honorable Phyllis J. Hamilton, United States

27  District Judge, at the Oakland Courthouse for the United States District Court in the Northern

28  District of California, Courtroom 3, located at 1301 Clay Street in Oakland, California.  This

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

Defendants' Motion for Summary Judgment

1  motion is brought pursuant to Federal Rules of Civil Procedure, Rule 56, and on the basis that

2  plaintiffs cannot establish that defendants violated their constitutional rights, that defendant Deputy

3  Gelhaus is entitled to qualified immunity, and that plaintiffs cannot establish liability on their

4  pendant state-law claims as a matter of law, as set forth below.

5       Said motion shall be based on this Notice of Motion, the Memorandum of Points and

6  Authorities below, the Declarations of Deputy Erick Gelhaus, Deputy Michael Schemmel, James

7  Norris, Paul Kayfetz, Mark Shattuck, Ph.D., Rich Word and Steven C. Mitchell, all filed and served

8  herewith, the factual and legal matters presented to this Court by all parties, on file herein, and any

9  oral argument or further briefing this Court may deem necessary.

10

11  DATED:  November 4, 2015            GEARY, SHEA, O'DONNELL, GRATTAN &
                         MITCHELL, P.C.

12

13                By    */s/  Steven C. Mitchell*

14                   STEVEN C. MITCHELL
                 Attorneys for Defendants

15                   ERICK GELHAUS and COUNTY OF
                 SONOMA

16

17

18

19

20

21

22

23

24

25

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

26

27

28

# TABLE OF CONTENTS

* * *

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF ISSUES ................................................................. 2

III.  SUMMARY OF FACTS ...................................................................... 3

IV.   STANDARD OF REVIEW ................................................................. 9

V.    LEGAL DISCUSSION ...................................................................... 11

     1.    Deputy Gelhaus Is Entitled to Summary Judgment on
         Plaintiffs' First Claim for Relief under 42 U.S.C. § 1983
         for Unreasonable Seizure (Fourth Amendment Claim) ..................... 11

           A.    Fourth Amendment Legal Standard – The use of
                deadly force is constitutionally permitted where
                an officer reasonably believes that either he or
                others faced a threat of serious physical harm ......................... 11

           B.    Deputy Gelhaus is entitled to Summary Judgment
                on plaintiffs' Fourth Amendment Claim because
                the undisputable evidence establishes that, as
                matter of law, he reasonably believed that both he
                and Deputy Schemmel faced an immediate, deadly threat ..................... 12

           C.    The Subsequent Discovery That The AK-47
                Turned Out To Be a Replica Is Not Constitutionally
                Determinative ........................................................................ 15

           D.    Deputy Gelhaus Is Further Entitled to Summary
                Judgment Because He Is Entitled To Qualified Immunity ..................... 18

     2.    The County and Deputy Gelhaus Are Entitled to Summary
         Judgment on Plaintiffs' Fourteenth Amendment Claim
         (Third Claim for Relief) – Plaintiffs' Cannot Establish A
         Violation Of The Fourteenth Amendment As A Matter Of Law ........................ 21

     3.    The County and Deputy Gelhaus Are Entitled to Summary
         Judgment on Plaintiffs' State-Law Wrongful Death Claims
         (Fourth and Fifth Claims for Relief) Because California
         Courts Apply The Same Standards In Excessive Force
         Cases as Federal Courts ........................................................... 22

     4.    The County Is Entitled To Summary Judgment Of Plaintiffs'
         Second Claim Because Plaintiffs Cannot Establish A Basis
         For Municipal Liability ............................................................ 23

VI.   CONCLUSION ................................................................................ 24

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

# TABLE OF AUTHORITIES

\* \* \*

<u>CASES</u>

*Acosta v. Hill*
    504 F.3d 1323 (9th Cir. 2007) ........................................................... 17

*Acri v. Varian Assoc.*
    114 F.3d 999 (9th Cir. 1997) ............................................................. 17

*Anderson v. Liberty Lobby Inc.*
    477 U.S. 242 (1986) ............................................................................. 9

*Anderson v. Russell*
    247 F.3d 125 (4th Cir. 2001) .............................................................. 20

*Ashcroft v. al-Kidd*
    131 S. Ct. 2074 (2011) ......................................................................... 18

*Bell v. City of East Cleveland*
    1997 U.S. App. LEXIS 28738 ............................................................. 19

*Billington v. Smith*
    292 F.3d 1177 (9th Cir. 2002) ............................................................ 12

*Blanford v. Sacramento County*
    406 F.3d 1110 (9th Cir. 2005) ................................................. 16, 17, 20

*Blossom v. Yarbrough*
    429 F.3d 963 (10th Cir. 2005) ............................................................. 20

*Bowles v. City of Porterville*
    571 Fed.Appx. 538 (9th Cir. 2014) ................................................ 15, 19, 20

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ............................................................................. 9

*City and County of San Francisco v. Sheehan*
    135 S. Ct. 1765 (2015) ............................................................... 11, 18, 21

*///*

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

*Drummond v. City of Anaheim*
    343 F.3d 1052 (9th Cir. 2003) .................................................................... 19, 20

*Elliott v. Leavitt*
    99 F.3d 640 (4th Cir. 1996) ........................................................................ 17, 19

*Garcia v. United States*
    826 F.2d 806 (9th Cir. 1987) ............................................................................ 12

*Gonzalez v. City of Anaheim*
    747 F.3d 789 (9th Cir. 2014) ............................................................................ 21

*Graham v. Connor*
    490 U.S. 386 (1989) ......................................................................... 11, 17, 22

*Harlow v. Fitzgerald* (1982)
    457 U.S. 800 ........................................................................................... 18

*Hayes v. City of San Diego (Hayes II)*
    57 Cal.4th 622 (2013) .................................................................................... 22

*Hayes v. County of San Diego (Hayes III)*
    736 F.3d 1223 (9th Cir. 2013) .......................................................................... 22

*Heien v. North Carolina*
    135 S. Ct. 530 (2014) ..................................................................................... 11

*Hernandez v. City of Pomona*
    46 Cal.4th 501 (2009) .................................................................................... 23

*Hunter v. Bryant*
    502 U.S. 224 (1991) ....................................................................................... 14

*Lal v. California*
    746 F.3d 1112 (9th Cir. 2014) ..................................................................... 12, 19

*Los Angeles v. Heller*
    475 U.S. 796 (1986) ................................................................................... 22, 23

*Matsushita Electrical Industry Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ......................................................................................... 9

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

*Messerschmidt v. Millender*
132 S.Ct. 1235 (U.S. 2012) ................................................................. 10

*Monell v. Department of Social Services of City of New York*
436 U.S. 658 (1978) ................................................................. 2, 22, 23

*Monroe v. City of Phoenix*
248 F.3d 851 (9th Cir. 2001) ................................................................. 17

*Pearson v. Callahan*
555 U.S. 223 (2009) ................................................................. 10, 18

*Penly v. Eslinger*
695 F.3d 843 (11th Cir. 2010) ................................................................. 15, 20

*Porter v. Osborn*
546 F.3d 1131 (9th Cir. 2008) ................................................................. 21

*Price v. Sery*
513 F.3d 962 (9th Cir. 2008) ................................................................. 12

*Reese v. Anderson*
926 F.2d 494 (5th Cir. 1991) ................................................................. 20

*Reichle v. Howards*
132 S. Ct. 2088 (2012) ................................................................. 18

*Reynolds v. County of San Diego*
84 F.3d 1162 (9th Cir. 1996) ................................................................. 12, 14, 17

*Riley v. California*
134 S. Ct. 2473 (2014) ................................................................. 11

*Ryburn v. Huff*
132 S. Ct. 987 (2012) ................................................................. 11

*Scott v. Harris*
550 U.S. 372 (2007) ................................................................. 9, 10, 13

*Scott v. Henrich*
39 F.3d 912 (9th Cir. 1994) ................................................................. 10, 12, 13, 19

LAW OFFICES OF
**GEARY,**
**SHEA,**
**O'DONNELL,**
**GRATTAN &**
**MITCHELL**
**P.C.**

*Smith v. City of Hemet*
    394 F.3d 689 (9th Cir. 2005) ................................................................. 11, 12, 19

*Smith v. Freland*
    954 F.2d 343 (6th Cir. 1992) ................................................................. 20

*T.W. Elec Serv., Inc. v. Pacific Elec. Contractors Association*
    809 F.2d 626 (9th Cir. 1987) ................................................................. 9

*Tennessee v. Garner*
    471 U.S. 1 (1985) ................................................................. 12

*United States v. Martinez-Jiminez*
    864 F.2d 664 ................................................................. 16

*Wilkinson v. Torres*
    610 F.3d 546 (9th Cir. 2010) ................................................................. 11, 21

LAW OFFICES OF
**GEARY,**
**SHEA,**
**O'DONNELL,**
**GRATTAN &**
**MITCHELL**
**P.C.**

1

## <u>STATUTES</u>

Federal Rules of Civil Procedure
>    Rule 56(a) .................................................................................................. 9

15 CFR 272.1 – 272.3 ........................................................................................ 6

15 U.S.C. § 5001 ................................................................................................ 6

42 U.S.C.
>    § 1983 ....................................................................................... 2, 3, 11, 22, 23

California Penal Code
>    § 20150 ...................................................................................................... 6
>    § 20155 ...................................................................................................... 6
>    § 20170 ...................................................................................................... 7
>    § 20170(a) ............................................................................................... 16
>    § 20175 ...................................................................................................... 7

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

# I.

## __INTRODUCTION__

Under well-established law, an officer is constitutionally permitted to use deadly force when the officer has an objectively reasonable belief that the person he encounters poses an imminent threat of death or serious injury.  Here, the undisputed material facts show that Deputy Gelhaus and Deputy Schemmel saw a person walking on a public sidewalk in a residential neighborhood known for gang activity carrying a gun that looked exactly like an AK-47 assault rifle.  The undisputed facts show that the person failed to comply with commands to drop the gun and, instead, turned and began to point the AK-47 assault weapon towards the deputies.   It cannot be disputed that from approximately 60 feet away, an individual turning and pointing a real AK-47 toward an officer, or toward anyone, poses anything other than an immediate threat of death or serious injury.  Finally, the undisputed facts show that a reasonable officer in the shoes of Deputy Gelhaus could have formed the belief that the weapon at issue here, which was designed to look exactly like a real AK-47, was in fact a real assault weapon and that therefore his life and the lives of others were in immediate danger.



///

///

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

Under these undisputable material facts, the use of deadly force was objectively reasonable. The fact that the replica weapon was subsequently determined, upon physical inspection, to be an air pellet gun without the mandated flame orange tip, does not change the constitutional analysis from an objective perspective.  The law rightly requires that the actions of a law enforcement officer in using deadly force cannot be judged based upon matters learned after the fact – here, notably, that the individual turned out to be 13 years old and that he had a replica airsoft "Kalashnikov AK-47", not a real AK-47.  While the outcome here resulted in the profoundly sad loss of a young life, a loss that is unquestionably unfathomable for plaintiffs and for many others, Deputy Gelhaus's split second decision to shoot before he and others were shot by an individual who appeared to be brandishing an AK-47 assault weapon after ignoring commands to drop the weapon, must by law be viewed in the context of the tense, uncertain and rapidly evolving circumstances confronting the deputies at the time.  Under that legal standard, as terribly tragic as the outcome is for all involved, Deputy Gelhaus did not violate the Fourth Amendment as a matter of law.  Summary judgment is warranted.

## II.

## <u>STATEMENT OF ISSUES</u>

The issues to be decided, and the short answers, are:

ISSUE NO.1:  Is Deputy Gelhaus entitled to summary judgment on Plaintiffs' First Claim for Relief under 42 U.S.C. § 1983 for unreasonable seizure (Fourth Amendment Claim)?

ANSWER:     Yes.  Deputy Gelhaus reasonably believed that the suspect posed an immediate and deadly threat to his safety and to the safety of others.  In addition, Deputy Gelhaus is shielded from liability by qualified immunity.

ISSUE NO.2:  Is the County entitled to summary judgment on Plaintiffs' Second Claim for Relief against the County under 42 U.S.C. § 1983 for unconstitutional customs and practices?

ANSWER:     Yes. Absent underlying constitutional violation, Plaintiffs' municipal liability claim also fails.  In addition, Plaintiffs has not shown any facts to prove a viable *Monell* claim against the County.

///

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

1   ISSUE NO.3:  Are Deputy Gelhaus and the County entitled to summary judgment on

2   Plaintiffs' Third Claim for Relief under 42 U.S.C. § 1983 for interference with familial integrity

3   (Fourteenth Amendment Claim)?

4   ANSWER:    Yes.  Plaintiffs have not shown any facts to prove the heightened

5   constitutional standard (purpose to harm unrelated to a legitimate law enforcement objective) for a

6   Fourteenth Amendment Claim.

7   ISSUE NO. 4: Are Deputy Gelhaus and the County entitled to summary judgment on

8   Plaintiffs' Fourth and Fifth Claim for Relief under California law (wrongful death and

9   survivorship)?

10   ANSWER:    Yes.  Plaintiffs' state law claims are to be judged from the same objective

11   reasonableness standard as the Fourth Amendment claim, and the undisputed material facts prove

12   that Deputy Gelhaus acted objectively reasonable under the facts and circumstances of this case.

13   In sum, summary judgment should be granted in Defendants' favor on all claims and

14   Plaintiffs' Second Amended Complaint should be dismissed in its entirety.

15   **III.**

16   **<u>SUMMARY OF FACTS</u>**

17   On October 22, 2013, at 3:15 p.m., Deputy Gelhaus and Deputy Michael Schemmel were on

18   regular patrol and drove northbound on Moorland Avenue in Santa Rosa in a marked Sheriff's

19   patrol car.  Deputy Gelhaus, a 24-year veteran of the Sheriff's Department, was acting as a Field

20   Training Officer for Deputy Michael Schemmel who had just transferred from the Marin County

21   Sheriff's Department.  Declaration of Erick Gelhaus ("Gelhaus Decl."), ¶¶3-4.  As they approached

22   the intersection of West Robles, Deputy Gelhaus saw an individual, now known to be Andy Lopez

23   ("Lopez"), walking northbound on Moorland on the west sidewalk.  The individual had his back to

24   the deputies and a hooded dark sweatshirt.  He carried what Deputy Gelhaus believed was an AK-

25   47 in his left hand, held by the pistol grip, with the barrel pointed toward the ground.  *Id.*, ¶5.

26   The Moorland Avenue neighborhood was known by Deputy Gelhaus and by the Department

27   to involve an extremely high level of dangerous gang activity, with a long and substantial history of

28   serious violent crimes, including weapon related crimes.  Gelhaus Decl., ¶4; Deposition Transcript

LAW OFFICES OF
**Geary,
Shea,
O'Donnell,
Grattan &
Mitchell
P.C.**

...

of Juan Valencia ("Valencia D.T."), 4:11-15, 8:11-17, 44:21-47:2, 48:15-48:25, 49:14-50:10,

53:14-55:8, attached as Exh. A to Declaration of Steven C. Mitchell ("Mitchell Decl.").  In fact,

Deputy Gelhaus had, in the past, confiscated an AK-47 less than two blocks away from the subject

intersection.  Gelhaus Decl., ¶4.

In response to seeing an individual walking in a residential neighborhood carrying what he

believed to be an AK-47, Deputy Gelhaus put out a "Code 20" call, an emergency call which

signals available units to respond immediately.  *Id.*, ¶¶5-6.  Deputy Schemmel, who was driving the

patrol car, was alerted to the individual by Deputy Gelhaus.  He, too, immediately formed the belief

that the individual was carrying an AK-47 assault weapon, based upon its distinctive profile,

including the "banana-shaped" 30-bullet magazine.  Declaration of Michael Schemmel ("Schemmel

Decl."), ¶¶3-4.

Deputy Schemmel blasted the siren ("chirped it") and activated all emergency lights and

flashers of the patrol car to alert the individual to their presence, in the hopes he would drop the

gun.  *Id.*, ¶¶4-5.  After a brief stop, he then proceeded through the intersection and brought the

patrol car to a stop angled into the southbound lane approximately 40 feet from the individual.[1]  *Id.*

He moved the patrol car forward in order to clear the intersection so that cross-traffic on West

Robles would not come between their patrol car and the individual with the AK-47, and so that they

could be in a better position to confront the individual.  *Id.*

As Deputy Schemmel was moving the car forward beyond the intersection, Deputy Gelhaus

removed his seatbelt, opened his door, and drew his service weapon to position himself in the "V"

---

[1] The distances involved are set forth in detail in the Declaration of Mark Shattuck, Ph.D.
("Shattuck Decl.")  Dr. Shattuck did a Time and Distance Analysis based upon the data gathered as
part of the investigation of the shooting.  Dr. Shattuck calculated that when the deputies first saw
Lopez walking with the weapon, he was approximately 130 feet away.  The closest distance which
Lopez was from the deputies was approximately 40 feet, when their patrol car came to a stop and
Lopez was still walking away from them. The actual shooting took place when Lopez was
approximately 62 feet from Deputy Gelhaus, as Lopez continued to walk away from them after they
vehicle came to a stop and after commands were issued.  Shattuck Declaration, ¶¶7-9.  The exact
distances involved are not critical, since the weapon Lopez was carrying was indistinguishable from
a real AK-47 at any of the possible distances involved, or anything close to the same. *Id*., ¶¶10-11,
Exh. A, see also, Kayfetz Decl.  An aerial photograph showing where the patrol car came to a stop
is also attached Gelhaus Decl., ¶6 Exh. A.

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

of his open door when they came to a stop.[2]  Gelhaus Decl., ¶8; Schemmel Decl., ¶5.  Despite the blasting of the siren and activation of the lights and flashers, the individual with the AK-47 continued to walk away from the patrol car.[3]  Deputy Schemmel observed the individual briefly glance over his right shoulder to look backwards after the siren was blasted.  Schemmel Decl., ¶5.

As the patrol car came to a stop, Deputy Gelhaus was now in position with his gun drawn and crouched behind his car door adjacent to the A pillar.  He gave at least one command to "Drop the gun!"  Gelhaus Decl., ¶8.  The one independent lay witness in position to hear the same, who was had recently parked his car across the field and was farther away from the deputies than Lopez, heard the deputy give two loud, clear and distinctive commands to "Drop the gun!" before he heard shots fired.  Deposition Transcript of Jordan Walker ("Walker D.T."), 8:12-9:23, 10:6-12:24, 13:24-16:24, 17:24-18:11, Exh. 51, attached as Exh. B. to Mitchell Declaration.  Deputy Schemmel also heard Deputy Gelhaus give Lopez at least one loud, direct command to the individual to "Drop the gun!" immediately after Deputy Gelhaus got out of the patrol car.  Schemmel Decl., ¶5.

Unfortunately, rather than dropping the weapon as commanded, the individual turned his whole body toward the deputies in a clockwise direction.  And, although the individual had been walking with the gun pointed down toward the sidewalk during the period of time when he was walking away from them, both deputies observed the barrel of the AK-47 come up and towards them when the individual turned to face them.  *Id.*, ¶5; Gelhaus Decl., ¶8.  In response to believing that he and others were about to be shot by an AK-47 assault weapon with a 30-bullet magazine, Deputy Gelhaus fired 8 rapid shots, 7 of which hit the individual.[4]  *Id.*; Shattuck Decl., ¶¶12-15.

---

[2] The position of the deputies immediately after the shooting was captured on a cell phone video, a frame of which is attached to the Declaration of James Norris ("Norris Decl.") as Exh. E.

[3] The blasting of the siren is also heard at the end of the emergency Code 20 radio call.  Shattuck Dec., ¶9, Exh. C.

[4] Deputy Schemmel was slower getting into position to shoot by virtue of being the driver and therefor having to brake the vehicle to a stop, put it in park, etc., whereas Deputy Gelhaus was able to take his seat belt off, draw his gun, open his door and begin to exit as the patrol car was slowing to a stop.  At the time of hearing the command or commands to "Drop the gun!" from Deputy Gelhaus, Deputy Schemmel was opening his door and beginning to draw his weapon.  When shots were fired, he was trying to get into a crouch position behind his car door in behind the A pillar.  By the time he was in position to shoot, Deputy Gelhaus had fired his rounds, and the individual had fallen backwards, and the weapon had dropped from his hands, so there was no longer any reason to shoot.  Schemmel Decl. ¶¶5, 7.

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

1  Deputy Gelhaus stopped shooting when the individual was falling to the ground and the weapon

2  was no longer in his hands.  Gelhaus Decl., ¶8; Shattuck Decl., ¶¶7-9, 14.[5]  The same independent

3  lay witness who had heard Deputy Gelhaus's commands also confirmed that the shots were fired in

4  "rapid succession."  Walker D.T., 20:25-21:10.

5       The deputies remained in position crouched behind their car doors, yelling at the individual

6  to "show them their hands" or commands to that effect, until additional units arrived.  Schemmel

7  Decl., ¶6.  Once additional units arrived, with the individual no longer holding the weapon and with

8  cover from other officers, Deputy Gelhaus and others approached the individual on the ground.  *Id.*;

9  Gelhaus Decl., ¶9.

10      Deputy Gelhaus then approached the individual who was now prone on the ground.  As he

11 was standing over the weapon and physically picked it up to move it away from the individual, he

12 realized for the first time that there was something about the weapon that looked different from a

13 real AK-47 and it was lighter in weight than a real AK-47.  Gelhaus Decl., ¶9.  In fact, upon close

14 inspection by investigating officers, it turned out that the weapon which Lopez was carrying and

15 pointed at the deputies was a plastic pellet gun known as a "Kalashnikov AK-47."  Norris Decl.,

16 ¶¶5-12.  The replica weapon, manufactured and sold under a license from Mikhail Kalashnikov

17 himself, the inventor of the real AK-47 assault weapon, replicates every relevant detail of a real

18 AK-47.  It is designed to look exactly like a real AK-47 in terms of the length, color, size and shape

19 of the stock, the pistol grip, the placement of the trigger, the distinctive banana shaped magazine

20 clip, the fore grip, the piston assembly, the sites, the length of the barrel, and every other detail.  *Id.*[6]

21      The one distinguishing aspect between a "Kalashnikov AK-47" and a real AK-47 is a flame

22 orange tip on the barrel of the gun, which is required by both federal and state law.[7]  *Id.*  A picture

---

23 [5] As discussed in further detail below, defendants' experts examined all physical evidence,
   including the bullet trajectories involved, and determined that the evidence corroborates that the
24 shots were initiated when Lopez was facing the deputies, with the weapon coming up and toward
   them, all consistent with the testimony of the deputies.  Norris Decl., ¶¶13-15; Shattuck Decl.,
25 ¶¶12-15.  Plaintiffs submitted no Rule 26 expert report or analysis to the contrary.

26 [6] See also Deposition Transcript of Mike Skrocki ("Skrocki D.T."), 6:1-13, 11:15-20, 12:2-23,
   14:3-15:9, 15:10-17:14, 18:14-19:2, 21:23-22:2, attached as Exh. C. to Mitchell Decl.

27 [7] See, 15 U.S.C. Section 5001 (a-c), 15 CFR 272.1 – 272.3; Penal Code section 20155 (requiring all
   imitation firearms to comply with Federal markings requirements); Penal Code section 20150
28 (making it illegal to alter markings on an imitation firearm to make it look more like a firearm).

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

1  showing the same replica Kalashnikov AK-47 sold with the lawfully mandated flame orange tip

2  compared to a real AK-47, is attached below.  *Id.*, ¶9 Exh. D.



13  In fact, it is illegal to remove the mandated bright orange tip (Cal. Penal Code § 20175),

14  illegal to brandish a replica firearm (Cal. Penal Code § 20170) and indeed illegal to walk down a

15  sidewalk on a public street without the weapon being covered or packaged (Cal. Penal Code §

16  20175).  See also, Norris Decl., ¶¶6, 12.  These laws exist due to the obvious potential for the exact

17  type of tragic, understandable confusion which can be and is caused by the indisputable visual

18  similarity between these replica guns, made under license from the real manufacturers, and real

19  guns.  *Id.*; See also Skrocki D.T., 23:10-25:8, Exh. 85.  Indeed, from the distances involved in this

20  case (over 100 feet when Lopez was first observed, approximately 40 feet at the closest, and

21  approximately 60 feet at the time of the shooting), the Kalashnikov AK-47 which Lopez was

22  carrying and pointed toward the deputies was visually indistinguishable from a real AK-47.

23  Declaration of Paul Kayfetz ("Kayfetz Decl."), ¶¶10-13, Exhs. B1 and B2; Norris Decl., ¶¶11-12,

24  Shattuck Decl., ¶¶10-11.[8]

LAW OFFICES OF
Geary,
Shea,
O'Donnell,
Grattan &
Mitchell
P.C.

[8] Defendants' experts performed a Visibility Study, showing the what the replica AK-47 looked like compared to a real AK-47 under the same lighting conditions, in the same setting, with a person wearing the same clothing and same height and weight of Lopez, from the same vantage point of Deputy Gelhaus on the date of the shooting.  Comparisons were also made as to the visibility had the orange tip been present.  Photographs comparing the same at the closest distances involved are attached to Kayfetz Decl. as Exhs. B1 and B2.

25

26

27

28

The orange tip which had been on the end of the Kalashnikov AK-47 which Lopez was carrying on the day of the incident came off two days earlier.  Deposition Transcript of BP ("BP D.T."), 14:14-16:7, attached as Exh. D to Mitchell Decl.[9]  When it broke off, Lopez and his friends discussed ways to try to put the orange tip back on, including using tape and taking it back to the store, because it looked "dangerous because it looked too much like a real gun"  *Id.*, 19:21-21:16.  They were unable to tape it back on and unable to take it back to a store because no parent was home.  *Id.,* 21:21-22:8, 24:24-25:25.

The day before the shooting, Lopez came to the house of the friend who owned the Kalashnikov AK-47 and asked to borrow it.  His friend told him he did not want him to take it with the broken tip, and that he was going to paint the gun.  Deposition Transcript of HP ("HP D.T."), 18:6 – 17, attached as Exh. E to Mitchell Decl.  Lopez took the gun with the missing orange tip anyway, telling his friend he would be sure to cover the gun up when walking with it in public.  His friend specifically told Lopez to cover the gun up because without the orange tip, it could be confused for a real gun.  *Id.*,18:18-19:25.

On the afternoon of the shooting, shortly before leaving his house and walking down the street with the replica AK-47 without the orange tip, Lopez's friend reminded him to cover the gun up when walking around with it in public.  Lopez told the friend that he intended to do so, by putting it in a backpack or bag ("because he don't want, like, the gun to get seen by other people"), but that he was unable to find anything to cover it up.   BP D.T., 62:1-63:17.  He eventually left his house with the replica weapon, without an orange tip, openly displayed and walked northbound on Moorland Avenue.  This is when Deputy Gelhaus and Deputy Schemmel encountered Lopez and saw what they believed was a real AK-47 assault rifle.

AK-47's have a 30-bullet magazine capable of unloading in either an automatic or semi-automatic setting in a matter of seconds.[10]  Norris Decl., ¶15; Gelhaus Decl., ¶10.  The large bullets they fire easily rip through both car doors and armored vests.  *Id.*  Gelhaus had prior personal

LAW OFFICES OF
**Geary,
Shea,
o'donnell,
Grattan &
mitchell
p.c.**

---

[9] Initials, rather than full names, are used when referring to deposition transcripts for depositions of witnesses who were minors.

[10] The cyclic rate of fire of an AK-47 is 600 rounds per minutes, and the bullets are fired at a velocity of 2400 feet per second.  Norris Dec., ¶15.

1    experience being fired upon with AK-47's in the military and had been involved in confiscating

2    several of the weapons in Sonoma County, including in the specific neighborhood where the

3    shooting occurred.  Gelhaus Decl., ¶10.  Thus, Deputy Gelhaus had an objectively reasonable belief

4    that when that weapon came around and up, after yelling commands to "Drop the gun!", that he,

5    Deputy Schemmel and anyone in the vicinity could have been rapidly killed or seriously injured by

6    bullets from an AK-47 if the firing was allowed to commence.

7                                    **IV.**

8                        <u>**STANDARD OF REVIEW**</u>

9            Summary judgment is proper if the pleadings, the discovery and disclosure materials on file,

10   and any affidavits show that there is no genuine issue as to any material fact and that the movant is

11   entitled to judgment as a matter of law.  See Fed. R. Civ. Rule 56(a).  The moving party bears the

12   initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v.*

13   *Catrett,* 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters

14   on which the non-moving party will have the burden of proof at trial.  The moving party need only

15   demonstrate to the court that there is an absence of evidence to support the non-moving party's

16   case.  *Id.* at 325.

17           Once the moving party has met its burden, the burden shifts to the non-moving party to "set

18   out 'specific facts showing a genuine issue for trial.'"  *Id.* at 324.  To carry this burden, the non-

19   moving party must "do more than simply show that there is some metaphysical doubt as to the

20   material facts."  *Matsushita Electrical Industry Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21   (1986).  "The mere existence of a scintilla of evidence… will be insufficient; there must be

22   evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty*

23   *Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party must set forth "significant probative

24   evidence tending to support the complaint" and may not rely on the mere allegations in the

25   pleadings in order to preclude summary judgment.  *T.W. Elec. Serv., Inc. v. Pacific Elec.*

26   *Contractors Association*, 809 F.2d 626, 630-631 (9th Cir. 1987); see also *Scott v. Harris,* 550 U.S.

27   372 (2007)("…the mere existence of *some* alleged factual dispute between the parties will not

28   defeat an otherwise properly supported motion for summary judgment; the requirement is that there

LAW OFFICES OF
**Geary,
Shea,
O'Donnell,
Grattan &
Mitchell
P.C.**

1   be no *genuine* issue of *material* fact.").

2        Summary judgment in deadly force cases requires the examination of all evidence in the

3   record, including medical reports, contemporaneous statements by the officer, and the available

4   physical evidence. *Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir. 1994).  Granting summary

5   judgment is appropriate in such cases where the Court concludes, "after resolving all factual

6   disputes in favor of the plaintiff that the officer's use of force was objectively reasonably under the

7   circumstances." *Id.* at 915; see also, *Scott v. Harris*, *supra,* 550 U.S. at 381 fn. 8 (After appropriate

8   review of record, "whether [officer's] actions have risen to a level warranting deadly force…is a

9   pure question of law," not a question of fact reserved for a jury.).

10        The existence of qualified immunity is also appropriately decided at summary judgment.

11   See, *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)(According to Supreme Court, "qualified

12   immunity is an immunity from suit rather than a defense to liability [and is thus] effectively lost if a

13   case is erroneously permitted to go trial.").  "The doctrine of qualified immunity protects

14   government officials 'from liability for civil damages insofar as their conduct does not violate

15   clearly established statutory or constitutional rights of which a reasonable person would have

16   known." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (U.S. 2012).

17        Accordingly, the immunity "gives government officials breathing room to make reasonable

18   but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate

19   the law." *Id.*  "Whether an official protected by qualified immunity may be held personally liable

20   for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of

21   the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken."

22   *Id.*

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

- 10 -
Defendants' Motion for Summary Judgment

# V.

# LEGAL DISCUSSION

1. **Deputy Gelhaus Is Entitled to Summary Judgment on Plaintiffs' First Claim for Relief under 42 U.S.C. § 1983 for Unreasonable Seizure (Fourth Amendment Claim)**

A. Fourth Amendment Legal Standard - The Use Of Deadly Force Is Constitutionally Permitted Where An Officer Reasonably Believes That Either He Or Others Faced A Threat Of Serious Physical Harm.

All claims that law enforcement officers have used excessive force—deadly or otherwise—must be analyzed under the Fourth Amendment and its "reasonableness" standard. *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005); see also *Graham v. Connor,* 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, supra,* 490 U.S. at 396-397. The inquiry is an objective one: "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 396. "The Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *City and County of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1775 (2015).

As the Supreme Court has emphasized, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California,* 134 S. Ct. 2473, 2482 (2014). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina,* 135 S. Ct. 530, 536 (2014). Any calculus of reasonableness must therefore embody allowance for the fact that officers must make these split-second judgments "in circumstances that are tense, uncertain, and rapidly evolving." *Graham, supra,* 490 U.S. at 396-397; see also *Ryburn v. Huff,* 132 S. Ct. 987, 991-992 (2012)(Supreme Court urges caution "about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."). A reasonable use of deadly force encompasses a range of conduct, and the availability of a less intrusive alternative will not render conduct unreasonable." *Wilkinson v. Torres,* 610 F.3d 546, 551 (9th Cir. 2010).

///

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

The most determinative issue to consider when evaluating the reasonableness of a specific use of force is whether the officer reasonably believed that a suspect posed an immediate threat to the safety of the officer or others.  See, *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005). Deadly force is therefore reasonable where the officer has probable cause to believe the suspect poses a significant threat of death or serious injury.  *Tennessee v. Garner,* 471 U.S. 1, 3, (1985).[11] As stated by the Ninth Circuit, "our case law requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force."  *Price v. Sery*, 513 F.3d 962, 971 (9th Cir. 2008).

It is well established that an officer is justified in using deadly force where a suspect threatens him with a weapon such as a gun or knife.  *Smith v. City of Hemet, supra,* 394 F.3d at 704 ("where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force");See also, *Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (deadly force justified where suspect grabbed the officer's gun after resisting arrest); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9thCir. 1996) (deadly force justified when suspect swung a knife at the officer); *Scott v. Henrich,* 39 F.3d 912, 915-916 (9th Cir. 1994) (Officers acted reasonably under Fourth Amendment when  using deadly force to stop a man who had opened an apartment door and pointed a gun at them); *Garcia v. United States,* 826 F.2d 806, 812 (9th Cir. 1987)( deadly force reasonable when used to defend against an assailant armed with a stick and a rock); *Lal v. California,* 746 F.3d 1112, 1117 (9th Cir. 2014) (officers complied with the constitution when they used deadly force to stop a man advancing towards them holding a large boulder over his head).

          B.     Deputy Gelhaus Is Entitled To Summary Judgment On Plaintiffs' Fourth Amendment Claim Because The Undisputable Evidence Establishes That, As Matter Of Law, He Reasonably Believed That Both He And Deputy Schemmel Faced An Immediate, Deadly Threat

Summary judgment is appropriate in deadly force cases where, after examination of all evidence available in the record, and resolving all material factual disputes in the plaintiffs' favor, it

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

---

[11] Per the Ninth Circuit, the terms "probable cause," as it is used in *Tennessee v. Garner,* and "reasonable belief" reflect the same standard.  *Price v. Sery,* 513 F.3d 962, 967-969 (9th Cir. 2008). Either way, the standard to justify the use of deadly force is an objective one, requiring an objective belief of an imminent threat of death or serious harm.  *Id.* at 969.

1   cannot reasonably be disputed that the officer's use of force was objectively reasonable under the

2   circumstances.  See, *Scott v. Henrich, supra,* 39 F.3d at 914; *Scott v. Harris, supra,* 550 U.S. at 381,

3   Fn. 8.  Here, even when viewed in the light most favorable to plaintiffs, the totality of evidence in

4   this case establishes the objective reasonableness of Deputy Gelhaus's use of force as a matter of

5   law.

6          First, it is undisputed that Deputy Gelhaus and Deputy Schemmel both saw what they

7   believed was an individual walking down the street in a neighborhood known for gang activity,

8   carrying a weapon they believed was an AK-47 assault rifle.  Gelhaus Decl., ¶¶4-8; Schemmel

9   Decl., ¶¶3-5.  Indeed, the objective evidence is overwhelmingly consistent.  The Code 20

10  emergency call (Gelhaus Decl., ¶6; Schemmel Decl., ¶4), the "chirp" of the siren (*Id.*; *Id.*; Walker

11  D.T., 11:7-12:11), the use of emergency lights and flashers (*Id.*), the commands to "Drop the Gun!"

12  (*Id.*, ¶8; *Id.*, ¶5; *Id.*, 14:17-16:7)," the deputies crouching behind their car doors (Schemmel Decl.,

13  ¶¶5-6; Norris Decl., ¶14, Exh. E), etc., all reinforce and confirm their testimony.  Since the

14  evidence also reflects the seriousness with which the deputies responded to seeing the AK-47 (i.e.,

15  the Code 20 emergency call, the use of emergency lighting, the commands, and the fact they

16  crouched behind their car doors for protection), it also objectively confirms that the deputies' belief

17  they were confronting an individual carrying a real AK-47 was genuine.

18         Second, the physical evidence corroborates both deputies' testimony that, at the time shots

19  were fired, Lopez had turned to face them while bringing the barrel of the AK-47 weapon up and

20  around in their direction.  The autopsy reports, bullet trajectories, wounds, relative positions of the

21  deputies and Lopez, the manner in which Lopez fell, and where the weapon he was holding fell, all

22  show, with the assistance of expert analysis, that both deputies faced an immediate and deadly

23  perceived threat, just as they have both testified to.  See, Norris Decl., ¶¶13-15; Shattuck Decl.,

24  ¶¶12-15.

25  ///

26  ///

27  ///

28  ///

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

Third, the evidence establishes that a reasonable officer from any of the distances involved in this matter (from 130 feet or more at the beginning, to approximately forty feet away at the closest) could have believed that the "Kalashnikov AK-47" air gun was real.[12]  The gun shares the same exact profile and defining characteristics as a real AK-47 and was in fact designed under license from the original designer of the assault rifle.  Norris Decl., ¶¶5-10.  A visibility study confirms that, at distances ranging from approximately forty feet to 125 feet, a reasonable officer could not have distinguished an airsoft AK-47 that lacked the bright orange tip mandated by law from a real assault rifle.  See, *Id.,* ¶11.  And it is undisputable that the gun at issue in this case lacked the bright orange tip mandated by law.  See, *Id.*, ¶¶5-6, Exh. B; Gelhaus Decl., ¶9, Exh. D; BP, D.T., 14:14-16:7.

That an officer would be likely to mistake Lopez's gun for a real one was in fact foreseen by the gun's manufacturer, leading it to warn any purchasers that:

> ANY ALTERATION AS TO THE COLORATION AND/OR MARKING OF THIS PRODUCT TO MAKE THIS PRODUCT LOOK MORE LIKE A FIREARM IS DANGEROUS, MAY CAUSE CONFUSION, MAY BE MISTAKEN TO BE A REAL FIREARM BY LAW ENFORCEMENT OFFICERS OR OTHERS, AND MAY BE A CRIME.

Skrocki D.T. 23:10-25:8, Exh. 85.  Indeed, plaintiff's own friends, who were his own age, recognized the substantial dangers posed by the visual similarities of the replica weapon without the orange tip, and warned Lopez regarding the same.  BP D.T., 19:21-21:16; HP D.T., 18:18-19:25.  It simply cannot be said that it was objectively unreasonable for both deputies to believe that the AK-47 was real, and for them to react as a law enforcement officer is trained to react, as though it was real.

Finally, expert analysis confirms Deputy Gelhaus's personal knowledge of the extraordinary danger that an AK-47 posed to the deputies at the time of the incident.  See, Norris Decl., ¶15.  It simply cannot be disputed that an AK-47 poses one of the most terrifying and immediate threats

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

---

[12] The dispositive issue is not whether "another reasonable interpretation of events can be…constructed after the fact," or whether "reasonable officers could disagree on the issue."  See, *Reynolds v. County of San Diego,* 84 F.3d 1162, 1170 citing *Hunter v. Bryant,* 502 U.S. 224, 228 (1991).  Rather, the relevant inquiry is whether a "reasonable officer *could* have believed that his conduct was justified."  *Id* (emphasis added).

1   possible, given its capabilities, including the ability to unload 30-bullets in a matter of a few

2   seconds, the ability of the bullets to rip through car doors and armored vests and a muzzle velocity

3   of 2400 feet per second.

4   　　　Given these undisputed facts, the use of deadly force in self-defense and in the defense of

5   others is reasonable as a matter of law.  In *Bowles v. City of Porterville,* 571 Fed.Appx. 538 (9th

6   Cir. 2014), a California Highway Patrol Officer shot and killed a fleeing suspect after the suspect

7   pivoted and pointed a metallic object at the officer.  The suspect was later found to be unarmed, but

8   the officers did find a cologne bottle at the scene of the incident.  According to the Court, the

9   "pivotal issue" was whether the officer's fear that the suspect was about to shoot him was

10  reasonable, and "[w]hile one might speculate as to other causes for [the officer's] real but mistaken

11  fear, plaintiffs [were not able to point] to any evidence that might support such speculation."  *Id.* at

12  540-541. The Court acknowledged that the officer had been required to make a "split second

13  judgment" in a situation that was "tense, uncertain, and rapidly evolving."  *Id.*  And it found that the

14  officer's "testimony [was] internally consistent and consistent with other known facts."  *Id.*  The

15  Court therefore affirmed summary judgment for the defendants.  *Id.*

16  　　　Here, the evidence before this court is far more robust than that available in *Bowles, supra,*

17  and yet, like in *Bowles,* is consistent with Deputy Gelhaus' testimony and supports the conclusion

18  that his fear of immediate deadly harm was reasonable.  Also as in *Bowles,* there is no evidence that

19  could reasonably support any speculation to the contrary.  Deputy Gelhaus was required to make a

20  split-second judgment in this "tense, uncertain, and rapidly evolving" situation where an individual

21  who failed to comply with commands to drop a weapon designed to look like a real AK-47 assault

22  rifle began pointing that rifle at the deputies.  That split-second judgment was reasonable as matter

23  of law.  See also, *Penley v. Eslinger,* 605 F.3d 843, 853-854 (11th Cir. 2010)(Deadly force used by

24  sniper against a fifteen-year-old student armed with an air pistol modified to look like a real

25  weapon reasonable given reasonableness of sniper's fear of imminent threat posed by weapon).

26  　　　　　C.　　The Subsequent Discovery That The AK-47 Turned Out To Be A Replica Is
            Not Constitutionally Determinative.

27

28  　　　Plaintiffs allege that the use of force at issue in this case was unreasonable because Lopez

LAW OFFICES OF
**Geary,
Shea,
O'Donnell,
Grattan &
Mitchell
P.C.**

1    "posed no danger or threat to defendant Gelhaus or anyone else." See, SAC, ¶43.  Plaintiffs are

2    presumably relying on the ultimate fact that the AK-47 turned out to be a realistic replica, and thus

3    "posed no danger or threat."  Any such argument fails for at least two reasons.

4           As a preliminary matter, while mere possession of a replica does not by itself justify the use

5    of deadly force, it is simply not true to say that possession of a replica firearm is not "dangerous."

6    In *United States v Martinez-Jiminez,* 864 F.2d 664, 666-668 (9th Cir. 1989) the Ninth Circuit

7    considered whether a "totally plastic and extremely light" toy gun constituted a "dangerous

8    weapon" sufficient to support a conviction for armed robbery under federal law.  The Ninth Circuit

9    answered the question in the affirmative, finding that use of the toy gun during the commission of a

10   robbery harms victims by creating fear of a deadly threat, requires law enforcement agencies to

11   respond differently due to an apparent threat to human life, and "creates a likelihood that the

12   reasonable response of police and guards will include the use of deadly force." *Id.* at 666-667; See

13   also, Cal. Penal Code § 20170(a)(statute prohibiting open display of imitation firearm in public

14   space).  This is to say nothing of the facts that the gun at issue here is "not a toy."  See, Skrocki

15   Depo., Ex. 85 (warning by manufacturer of gun includes admonishment that it is not for children

16   and that removal of the orange tip could result in confusion by law enforcement).

17          Regardless, the issue is not whether the AK-47 by itself is or is not dangerous, but whether

18   Deputy Gelhaus was reasonable*,* in light of the specific facts and circumstances confronting him,

19   when he concluded that it was.  In *Blanford v. Sacramento County*, 406 F.3d 1110, 1112-1114 (9th

20   Cir. 2005) two deputies used deadly force when confronting a man walking around a residential

21   neighborhood carrying a two-and-half foot long sword. The officers justified their use of force on

22   the grounds that the man did not listen to their repeated commands to drop the weapon, that he was

23   acting erratically, and that he was trying to enter an unknown residence and thus believed to pose a

24   danger to those inside.  As it turned out, the man had been listening to loud music on his

25   headphones and thus could not hear the commands.  He had just taken anti-psychotic medication.

26   And the house he had been trying to enter was his own.  "In hindsight," the Ninth Circuit agreed,

27   plaintiff's claim that he did not pose a deadly threat was reasonable.  See, *Id.* at 1115-1116.

28          "However," the Court demurred, "the reasonableness of a particular use of force must be

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* citing *Graham, supra,* 490 U.S. at 396.  "[F]rom this perspective," the Court concluded, "the deputies had cause to believe that [the man] posed a serious danger to themselves and to anyone in the house or yard that he was intent upon accessing, because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down." *Id.* at 1116.  Accordingly, and on this basis, the Court affirmed summary judgment for the deputies.

Here, like in *Blanford,* and from their perspective, Deputies Gelhaus and Schemmel had cause to believe that Lopez posed a serious danger to themselves and to anyone nearby because Lopez failed to heed commands and was perceived to be armed with a deadly assault rifle that he refused to put down and was in the process of pointing at the deputies.  Also per *Blanford,* whether Lopez did or did not ultimately pose a threat "in hindsight" is immaterial.  The circumstances confronting Deputy Gelhaus at the time of the subject incident, just like those confronting the deputies in *Blanford,* objectively and reasonably led him to conclude that Lopez posed an immediate and unacceptable risk of harm.

"The Fourth Amendment does not require omniscience, and absolute certainty of harm need not precede an act of self-protection."  *Elliott v. Leavitt,* 99 F.3d 640, 641 (4th Cir. 1996).  Rather, the Constitution only requires that an officer act reasonably, and, given the objective evidence before this court, it cannot reasonably be disputed that Deputy Gelhaus did so here.  See also, *Monroe v. City of Phoenix,* 248 F.3d 851, 862 (9th Cir. 2001)("Surely [an officer is] not required to wait and be seriously injured or killed before exercising his judgment and brining the situation under control.") overruled on other grounds by *Acosta v. Hill,* 504 F.3d 1323 (9th Cir. 2007); *Reynolds v. City of San Diego,* 858 F. Supp. 1064, 1072 (S.D. Cal. 1994)("The Courts cannot ask an officer to hold fire in order to ascertain whether the suspect will, in fact, injury or murder the officer.  The high number of officer mortalities in recent years illustrate the unreasonableness of such a notion.") affirmed in part and remanded in apart by 84 F.3d 1162 (9th Cir. 1996), overruled in part by *Acri v. Varian Assoc.,* 114 F.3d 999 (9th Cir. 1997).

///

///

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

1          D.    Deputy Gelhaus Is Further Entitled to Summary Judgment Because He Is
2                Entitled To Qualified Immunity.

3      Qualified immunity protects government officials and shields them "from liability for civil

4  damages insofar as their conduct does not violate clearly established statutory or constitutional

5  rights of which a reasonable person would have known." *Harlow v. Fitzgerald* (1982) 457 U.S.

6  800, 818.  A court may grant qualified immunity on the ground that a purported right was not

7  'clearly established' by prior case law, without resolving the often more difficult question whether

8  the purported right was violated at all.  *Pearson* v. *Callahan,* 555 U.S. 223, 226 (2009).

9      For a constitutional right to be clearly established, its contours must be sufficiently clear

10 such that "every reasonable official would have understood that what he is doing violates that

11 right." *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2083 (2011).   A case need not be directly on point,

12 "but existing precedent must have placed the statutory or constitutional question beyond debate."

13 *Id.*; see also *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  "This exacting standard gives

14 government officials breathing room to make reasonable but mistaken judgments by protecting all

15 but the plainly incompetent or those who knowingly violate the law."  *City and County of San*

16 *Francisco v. Sheehan,* 135 S. Ct. 1765, 1774 (2015).

17     The Supreme Court has repeatedly warned that, for purposes of qualified immunity, clearly

18 established law must not be established at a high level of generality.  *al-Kidd, supra,* 131 S. Ct. at

19 2084.  "The general proposition, for example, that an unreasonable search or seizure violates the

20 Fourth Amendment is of little help in determining whether the violative nature of particular conduct

21 is clearly established."  *Id.*  "Qualified immunity is no immunity at all if 'clearly established' law

22 can simply be defined as the right to be free from unreasonable searches and seizures."  *Sheehan,*

23 *supra,* 135 S. Ct. at 1775-1776.

24     Defendants are not aware of any case law that would clearly establish that an officer violates

25 the Fourth Amendment by using deadly force to defend himself and others against an individual

26 who is armed with an AK-47 assault rifle, who refuses to listen to commands, and who turns

27 towards the deputies while raising the barrel of the weapon up and in their direction.  To the

28 contrary, the law is well settled that the use of deadly force under these circumstances is objectively

LAW OFFICES OF
**Geary,
Shea,
o'donnell,
Grattan &
mitchell
p.c.**

reasonable and constitutionally permissible.  See, *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) ("Thus, where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force"); see also *Scott v. Henrich,* 39 F.3d 912, 915-916 (9th Cir. 1994)(officers did not violate the constitution when they used deadly force after a man opened an apartment door and pointed a gun at them); *Elliott v. Leavitt,* 99 F.3d 640, 641 (4th Cir. 1996)(deadly force reasonable in response to handcuffed suspect pointing gun at officers while inside vehicle).

Established law does not require an officer to make absolutely certain that a perceived threat is real before using deadly force.  Indeed, the relevant case law established the contrary, requiring only that the officer's perception of the threat be reasonable, taking into consideration the fact that the officer was required to make a split-second decision in circumstances which are tense, uncertain, and rapidly evolving.  See, *Lal v. California,* 746 F.3d 1112, 1117 (9th Cir. 2014); *Bowles, supra,*; *Blanford, supra.*

A Sixth Circuit unpublished case that is directly on point reflects the application of existing law to the facts of this case.[13]  In *Bell v. City of East Cleveland,* 1997 U.S. App. LEXIS 28738, an officer followed a fourteen-year-old boy after the police department had been notified that he had been seen walking in a residential neighborhood with a gun.  Witnesses in the area heard the officer command the boy to drop to the ground.  The boy grabbed his shirt instead however, turned around, and pointed a gun-like object at the officer, who promptly responded with deadly force.  The gun that was found in his possession was a toy BB gun which resembled a real firearm.  *Id.* at 2-3.

As did the Ninth Circuit in *Bowles, supra,* 571 Fed.Appx. at 540, the Sixth Circuit identified that the "crucial determination" was "whether [the officer's] belief that [the boy] posed a threat of serious physical harm was objectively reasonable."  *Id.* at 7.  Since the objective reasonableness of the officer's actions must be viewed from his perspective, the Court also noted that:

> Under *Graham*, we must avoid substituting our personal notions of
> proper police procedure for the instantaneous decision of the officer

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.

---

[13] A court may look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other district courts and even unpublished district court decisions. *Drummond v. City of Anaheim,* 343 F.3d 1052, 1060 (9th Cir. 2003).

> at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Id.* at p. 8 citing *Smith v. Freland,* 954 F.2d 343, 346 (6th Cir. 1992).  The Court concluded that the officer's actions were reasonable in light of the facts confronting him, which included a gun that others confirmed looked real, the boy's failure to comply with commands, and the fact that the boy pointed the gun at the officer.  *Id.* at 9.  Moreover, objective evidence, such as witness testimony, forensic evidence, and the location of the gun after the incident, corroborated the officer's account of the events.  *Id.* at 8-12.  "Consequently," the Sixth Circuit found that "there [were] no material questions of fact regarding the issue of [the officer's] qualified immunity" and affirmed summary judgment.  *Id.* at 12, 16-17.

The other circuits are in accord with both the Ninth Circuit, as established by *Bowles* and *Blanford,* and the Sixth Circuit, as reflected in *Bell.*  See, *Penley v. Eslinger, supra,* 605 F.3d at 853-854(11th Cir. 2010)(deadly force against a fifteen-year-old student armed with plastic air pistol reasonable); *Anderson v. Russell,* 247 F.3d 125, 131 (4th Cir. 2001)(use of deadly force "as a protective measure before directly observing a deadly weapon" reasonable where officers confused shoe polish container for a firearm); *Reese v. Anderson,* 926 F.2d 494. 500-501 (5th Cir. 1991)(fear of imminent threat of significant harm reasonable, thus justifying deadly force, where unarmed sixteen-year-old passenger in vehicle refused to comply with commands and appeared to reach down to grab a weapon); *Blossom v. Yarbrough,* 429 F.3d 963, 968 (10th Cir. 2005)(Fact that a suspect "was unarmed is not outcome determinative," with Tenth Circuit rejecting "the argument that only a suspect armed with a deadly weapon poses a physical threat sufficient to justify deadly force.").

Accordingly, Deputy Gelhaus did not violate clearly established law.  He perceived a direct and imminent deadly threat.  The evidence in this case, including witness testimony, photographs of the gun at issue, autopsy reports, etc., supports his account of the events.  And pursuant to well-established authority, he was not required to wait until he was 100% certain before defending himself.  Qualified immunity therefore applies and Deputy Gelhaus is entitled to summary

LAW OFFICES OF
Geary,
Shea,
o'donnell,
Grattan &
mitchell
p.c.

– 20 –
Defendants' Motion for Summary Judgment

1   judgment on Plaintiffs' Fourth Amendment Claim (First Claim for Relief).  See also, *City and*

2   *County of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1778 (2015).

3   **2.    The County and Deputy Gelhaus Are Entitled to Summary Judgment on**
        **Plaintiffs' Fourteenth Amendment Claim (Third Claim for Relief) -Plaintiffs'**

4       **Cannot Establish A Violation Of The Fourteenth Amendment As A Matter Of**
        **Law**

5

6       Plaintiffs Rodrigo Lopez and Sujay Cruz allege that defendants violated their right to

7   familial integrity guaranteed by the Fourteenth Amendment's guarantee of due process.  See, SAC,

8   ¶¶55-60.  However, only official conduct that "shocks the conscience" is cognizable as a due

9   process violation.  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  "In determining whether

10  excessive force shocks the conscience, a court must first ask whether the circumstances are such

11  that actual deliberation by the officer is practical." *Wilkinson v. Torres,* 610 F.3d 546, 554 (9th Cir.

12  2010).  "Where, as here, the officers did not have time to deliberate, a use of force shocks the

13  conscience only if the officers had a purpose to harm the decedent for reasons unrelated to

14  legitimate law enforcement objectives." *Gonzalez v. City of Anaheim,* 747 F.3d 789, 797-798 (9th

15  Cir. 2014).

16      Here, the entire incident—from when the deputies first saw Lopez, to when Deputy Gelhaus

17  made a Code 20 emergency call for help, to when he ordered Lopez to drop the gun, to when he

18  fired his weapon—lasted approximately 20 seconds, with the decision to use force made only after

19  Lopez began raising the gun in the deputies' direction.  Deputy Gelhaus certainly had no time to

20  deliberate, and there is absolutely no evidence to support any claim that he used force for any other

21  reason than to defend himself and others.

22      Plaintiffs therefore cannot establish that any conduct "shocks the conscience" and therefore

23  cannot establish a violation of Fourteenth Amendment due process rights as a matter of law. See,

24  *Wilkinson v. Torres, supra,* 610 F.3d 546 at 554-555 (Summary judgment on Fourteenth

25  Amendment claim proper where eleven seconds elapsed during sequence of events leading to use of

26  deadly force and there was no evidence of illegitimate purpose to harm); *Gonzalez v. City of*

27  *Anaheim,* 747 F.3d 789, 797 (9th Cir. 2014)(Summary judgment on Fourteenth Amendment claim

28  affirmed where officers had no time to deliberate and there was no evidence that officers had any

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

1  "ulterior motive" to use deadly force); *Hayes v. County of San Diego* (*Hayes III*), 736 F.3d 1223,

2  1230-1231 (9th Cir. 2013)(summary judgment for officers affirmed where decision to use deadly

3  force arose from a "snap judgment" after seeing a knife and there was no evidence that officers

4  acted for any reason other than self-defense).[14]

5       **3.    The County and Deputy Gelhaus Are Entitled to Summary Judgement on
Plaintiffs' State-Law Wrongful Death Claims (Fourth And Fifth Claims for
Relief) Because California Courts Apply The Same Standards In Excessive
Force Cases As Federal Courts.**

8       Plaintiffs allege in their Fourth and Fifth Claims for Relief that defendants are liable under

9  state-law wrongful death theories. [15] Police officers have a duty in California to act reasonably

10  when using deadly force.  *Hayes v. City of San Diego (Hayes II),* 57 Cal.4th 622, 629 (2013).  In

11  determining whether an officer *breached*, that duty of care, however, California Courts apply the

12  same standards applicable in federal cases.  Accordingly, the "'reasonableness' of a particular use of

13  force must be judged from the perspective of a reasonable officer on the scene, rather than with the

14  20/20 vision of hindsight." *Hayes II, supra,* 57 Cal.4th at 632. citing *Graham v. Connor*, 490 U.S.

15  386, 396 (1989).  The reasonableness standard in state court also afford officers discretion to

16  accommodate the difficulty of their task:

17          [A]s long as an officer's conduct falls within the range of conduct that
is reasonable under the circumstances, there is no requirement that he
or she choose the 'most reasonable' action or the conduct that is the
least likely to cause harm and at the same time the most likely to
result in the successful apprehension of a violent suspect, in order to
avoid liability for negligence.

20  *Id.*  And "[s]ummary judgment is [is still] appropriate when the trial court determines that, viewing

21  the facts most favorably to the plaintiff, no reasonable juror could find negligence."  *Id.*

---

[14] Plaintiffs also allege that the County of Sonoma is liable in their Third Claim for relief.  The
County, however, cannot be liable under 42 U.S.C. § 1983 unless plaintiffs can show that the
constitutional deprivation was committed pursuant to official policy or custom.  See, *Monell v.
Department of Social Services,* 436 U.S. 658, 690 (1978).  Plaintiffs do not allege any facts in
support of this theory.  In any event, since plaintiffs cannot establish that Deputy Gelhaus violated
the Fourteenth Amendment, they cannot establish that the County of Sonoma can be liable. See,
*Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)

[15] Plaintiffs title their Fifth Claim for Relief "Survivorship."  Survivorship," however, is not an
independent substantive claim, only affords standing under California law.  See, *Hayes v. County of
San Diego,* 736 F.3d 1223, 1228-1229 (9th Cir. 2013)

LAW OFFICES OF
**Geary,
Shea,
O'donnell,
Grattan &
Mitchell
P.C.**

- 22 -
Defendants' Motion for Summary Judgment

1  Here, as set forth above, Deputy Gelhaus acted reasonably as a matter of law. Accordingly,

2  and since he acted reasonably under the Fourth Amendment, he acted reasonably under state-law

3  negligence principles. Defendants are therefore entitled to summary judgment on plaintiffs' state

4  law wrongful death claims. See, *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 513

5  (2009)(California Supreme Court holds that collateral estoppel bars re-litigation of state-law

6  negligence claim after defense verdict in federal excessive force claim because issue resolved

7  against plaintiffs in federal court, i.e., whether officers acted with reasonable care, was "precisely

8  the issue" now raised in state court).

9  **4.      The County Is Entitled To Summary Judgment Of Plaintiff's Second Claim
             Because Plaintiffs Cannot Establish A Basis For Municipal Liability.**

10

11  The law is well established that a municipality cannot be held liable in a 42 U.S.C. § 1983

12  action under a respondeat superior theory of liability. *Monell v. Department of Social Services of*

13  *City of New York,* 436 U.S. 658, 690 (1978). Instead, to establish liability against a municipality, a

14  plaintiff must establish that the constitutional deprivation was committed pursuant to official

15  municipal policy or custom. *Id.* Of course, where a plaintiff is unable to establish a constitutional

16  deprivation, the plaintiff cannot establish that the municipality is liable either. See, *Los Angeles v.*

17  *Heller,* 475 U.S. 796, 799 (1986) ("[N]either *Monell....*or any other of our cases authorizes the

18  award of damages against a municipal corporation based on the actions of one of its officers when

19  in fact the jury has concluded that the officer inflicted no constitutional harm.").

20  Here, as outlined above, plaintiffs cannot establish the existence of a constitutional

21  deprivation as a matter of law. In any event, there is no evidence that the County's use of force

22  policies, hiring practices, training practices, or any other policy, custom, or practice contributed to

23  any alleged constitutional violation. See, Declaration of Rich Word; Deposition Transcript of

24  James Naugle, 4:12-24; 93:15 – 95:8, attached as Exh. F to the Mitchell Decl. The County of

25  Sonoma is therefore entitled to summary judgment on plaintiffs' Second Claim for Relief.

26  ///

27  ///

28  ///

LAW OFFICES OF
**Geary,
Shea,
O'donnell,
Grattan &
Mitchell
P.C.**

1

## VI.

2

## CONCLUSION

3       Given the undisputed facts known to Deputy Gelhaus at the time his split-second decision to

4   use his duty weapon was made, his use of deadly force was objectively reasonable from the

5   perspective of a law enforcement officer.  Had the AK47 turned out to be real, no one could dispute

6   that any other response would have been appropriate.  The tragic fact that the weapon later turned

7   out to be a replica made to look exactly like a real AK47, and not a real AK47, does not change the

8   constitutional and legal analysis which must be applied.  As sad as the loss is for all involved,

9   defendants are entitled to summary judgment.

10  DATED:  November 4, 2015                    GEARY, SHEA, O'DONNELL, GRATTAN &
                                                MITCHELL, P.C.

11

12

                                                By ___/s/_____Steven C. Mitchell_____
13                                                  STEVEN C. MITCHELL
                                                    Attorneys for Defendants
14                                                  ERICK GELHAUS and COUNTY OF
                                                    SONOMA
15

16

17

18

19

20

21

22

23

24

25

26  LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL,
GRATTAN &
MITCHELL
P.C.**

27

28

Defendants' Motion for Summary Judgment