1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESTATE OF ANDY LOPEZ, et al.,

Plaintiffs,

v.

ERICK GELHAUS, et al.,

Defendants.

Case No. 13-cv-5124-PJH

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment came on for hearing before this court on December 9, 2015. Plaintiffs Estate of Andy Lopez, Rodrigo Lopez, and Sujay Cruz ("plaintiffs") appeared through their counsel, Arnoldo Casillas. Defendants Erick Gelhaus and County of Sonoma ("defendants") appeared through their counsel, Steven Mitchell. Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

On October 22, 2013, at approximately 3:15pm, 13-year-old Andy Lopez ("Andy") was walking along a sidewalk in Sonoma County, carrying a toy rifle. See Second Amended Complaint ("SAC"), ¶ 20. According to defendants, the rifle was designed to look like a real AK-47 assault rifle, and the orange tip used to distinguish toy rifles had been removed. See Dkt. 63 at 6-7.

Two Sonoma County Sheriff's deputies, Erick Gelhaus and Michael Schemmel, were patrolling the area at the time. Though the deputies had not received any reports

1   about an individual carrying a weapon, they noticed Andy on their own, and decided to

2   approach him.  SAC, ¶¶ 23-24.

3          The deputies stopped their patrol car and activated its siren and emergency lights.

4   Dkt. 63 at 4.  At that time, Andy was approximately 35-40 feet away from the deputies,

5   with his back facing towards them.  SAC, ¶¶ 24-25.  Either one or both of the officers (the

6   parties dispute this fact) drew their weapons and pointed them at Andy, and at least one

7   of the deputies shouted out a command to Andy (defendants claim that Gelhaus gave a

8   command to "drop the gun!").  See SAC, ¶¶ 24, 26; Dkt. 63 at 5.  In response, Andy

9   turned towards the deputies.  SAC, ¶ 27.  There is no dispute that, up until this point,

10  Andy was holding the rifle in one hand, at his side, pointing down.  Dkt. 63 at 5.

11  Defendants claim that, as Andy turned towards the deputies, they observed the barrel of

12  the rifle "come up and towards them," while plaintiffs allege that "[t]he toy gun was at his

13  side."  See Dkt. 63 at 5; SAC, ¶ 27.  As Andy turned, Gelhaus fired his pistol, hitting Andy

14  and sending him to the ground.  SAC, ¶ 30.  Gelhaus continued to fire at Andy while he

15  lay on the ground, and Andy ultimately died while on the sidewalk.  SAC, ¶¶ 30, 34.

16         Andy's parents, Rodrigo Lopez and Sujay Cruz, filed this suit on November 4,

17  2013, on behalf of themselves and the Estate of Andy Lopez.  The operative second

18  amended complaint was filed on June 20, 2014, and asserts five causes of action: (1)

19  unreasonable seizure under section 1983 against defendant Gelhaus, (2) municipal

20  liability for unconstitutional customs/practices under section 1983 against defendant

21  Sonoma County, (3) interference with familial integrity (styled as a substantive due

22  process violation) under section 1983 against defendants Gelhaus and Sonoma County,

23  (4) wrongful death against defendants Gelhaus and Sonoma County, and (5) a

24  "survivorship" claim against defendants Gelhaus and Sonoma County.

                              **DISCUSSION**

26  A.    Legal Standard

27         A party may move for summary judgment on a "claim or defense" or "part of . . . a

28  claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there

1    is no genuine dispute as to any material fact and the moving party is entitled to judgment

2    as a matter of law.  Id.

3          A party seeking summary judgment bears the initial burden of informing the court

4    of the basis for its motion, and of identifying those portions of the pleadings and discovery

5    responses that demonstrate the absence of a genuine issue of material fact.  Celotex

6    Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the

7    outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

8    dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable

9    jury to return a verdict for the nonmoving party.  Id.

10         Where the moving party will have the burden of proof at trial, it must affirmatively

11   demonstrate that no reasonable trier of fact could find other than for the moving party.

12   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue

13   where the nonmoving party will bear the burden of proof at trial, the moving party may

14   carry its initial burden of production by submitting admissible "evidence negating an

15   essential element of the nonmoving party's case," or by showing, "after suitable

16   discovery," that the "nonmoving party does not have enough evidence of an essential

17   element of its claim or defense to carry its ultimate burden of persuasion at trial."  Nissan

18   Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000);

19   see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to

20   the district court that there is an absence of evidence to support the nonmoving party's

21   case).

22         When the moving party has carried its burden, the nonmoving party must respond

23   with specific facts, supported by admissible evidence, showing a genuine issue for trial.

24   Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence

25   of only "some alleged factual dispute between the parties will not defeat an otherwise

26   properly supported motion for summary judgment."  Anderson, 477 U.S. at 247-48.

27         When deciding a summary judgment motion, a court must view the evidence in the

28   light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

United States District Court
Northern District of California

3

1    Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

2    B.      Legal Analysis

3            As an initial matter, at the hearing, plaintiff's counsel conceded that summary

4    judgment was warranted as to the second cause of action and as to the third cause of

5    action to the extent asserted against Sonoma County.  Thus, as to those two claims,

6    defendants' motion is GRANTED.

7            The court will address the remaining claims in the order in which they are asserted

8    in the SAC, starting with the first cause of action, brought under section 1983 against

9    defendant Gelhaus.  The complaint alleges that defendant Gelhaus, by shooting and

10   killing Andy, used excessive force and thereby violated his Fourth Amendment right to be

11   free of unreasonable seizures.

12           The legal standard applicable to this claim is one of "reasonableness."  See, e.g.,

13   Graham v. Connor, 490 U.S. 386, 395 (1989); Tennessee v. Garner, 471 U.S. 1, 7

14   (1985).  The use of force is reasonable under the Fourth Amendment if it would seem

15   justified to a reasonable officer in light of the surrounding circumstances; however, the

16   use of deadly force is not justified "unless it is necessary to prevent escape and the

17   officer has probable cause to believe that the suspect poses a significant threat of death

18   or serious physical injury to the officer or others."  Garner, 471 U.S. at 3.  The inquiry is

19   an objective one, with the question being "whether the officers' actions are 'objectively

20   reasonable' in light of the facts and circumstances confronting them."  Graham, 490 U.S.

21   at 397.

22           The key question on this motion is whether it was objectively reasonable for

23   defendant Gelhaus to believe that Andy posed a "significant threat of death or serious

24   physical injury to the officer or others" at the time of the shooting.  Defendants argue that,

25   because Andy was carrying what appeared to be an AK-47 assault rifle, and because he

26   failed to drop the rifle when ordered to do so and instead started turning his body towards

27   the deputies, with the barrel of the rifle "com[ing] up and towards them," it was

28   reasonable to believe that Andy posed a significant threat to them.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    Defendants further argue that it is "well established that an officer is justified in

2    using deadly force where a suspect threatens him with a weapon such as a knife or gun."

3    Dkt. 63 at 12.  While that statement of the law is correct, defendants have not established

4    that Andy actually threatened the officers with the rifle[1] that he was holding.  In fact,

5    defendants do not allege that Andy ever pointed the rifle at either officer or at anyone

6    else.  Instead, defendants use carefully-phrased language to describe Andy's actions,

7    saying only that Andy "turned and began to point the AK-47 towards the deputies, or that

8    Andy was "bringing the barrel of the AK-47 weapon up and around in their direction," or

9    that he was "in the process of pointing [it] at the deputies."  See Dkt. 63 at 1, 13, 17

10   (emphasis added).  In defendant Gelhaus' declaration, he states that, as Andy turned

11   around, "the barrel of the weapon [was] coming up." Dkt. 64, ¶ 8.  In contrast, each of

12   this circuit's cases cited in defendants' motion involves a more direct threat.

13   In Billington v. Smith, the suspect was "locked in hand-to-hand combat" with a

14   police detective, and the detective "was losing."  292 F.3d 1177, 1185 (9th Cir. 2002).

15   The suspect "actively, violently, and successfully resisted arrest and physically attacked

16   Detective Smith and tried to turn Smith's gun against him."  Id.  "No one who saw the fight

17   disputes that [the suspect] was the aggressor, and that he kept beating Detective Smith

18   even when Detective Smith tried to retreat."  Id.  The suspect "was trying to get the

19   detective's gun, and he was getting the upper hand," and on those facts, the court found

20   that he posed an imminent threat of injury or death.  Id.

21   In Reynolds v. County of San Diego, the suspect had a knife and was ordered to

22   drop it, which he did.  84 F.3d 1162, 1164 (9th Cir. 1996).  However, as an officer

23   approached, the suspect "suddenly sat up and grabbed the knife."  Id. at 1165.  The

24   officer attempted to disarm him with a kick, but missed, so he then pressed his knee into

25   the suspect's back and pressed his gun on the suspect's neck, telling him to again drop

26   the knife.  The suspect refused to comply, and instead "twisted his body and made a

27

28   [1] For now, the court will put aside the issue of whether it was reasonable to believe that the rifle possessed by Andy was an actual AK-47, rather than a toy rifle.

5

sudden, backhanded, upward swing toward [the officer] with his right hand, which was holding the knife." Id. It was then that the officer fired on the suspect, killing him. The court found that, by "suddenly swinging at [the officer] with the knife," the suspect threatened the officer's life "or at least put him in fear of great bodily injury." Id. at 1168.

In Scott v. Heinrich, officers responded to a call about a man who was firing a gun and reportedly "acting strange or crazy." 39 F.3d 912, 914 (9th Cir. 1994). Officers banged on and kicked the suspect's door, and when it opened, the suspect "stood in the doorway," holding a "long gun" and "pointed it at them." Id. The officers fired upon the suspect, killing him. The court found that the officers' use of force "fully complied with the requirements of the Fourth Amendment." Id. at 916.

In Garcia v. United States, a group of Mexican citizens was attempting to cross the border into the United States. 826 F.2d 806, 807 (9th Cir. 1987). A border patrolman stopped one of them, and after the suspect resisted, the patrolman threw him to the ground and handcuffed him. Id. at 808. A group of five to seven people, including the plaintiff (Garcia), approached the officer with sticks and rocks, and Garcia "drew closer, brandishing the stick and rock with upraised arms." When Garcia was three to five feet away, the officer shot him in the abdomen. The court found that Garcia's "felonious and deadly assault" gave the officer probable cause to believe that Garcia posed a "threat of serious physical harm" to him. Id. at 812.

Finally, in Lal v. California, the suspect fled his home after police responded to his wife's report of a domestic disturbance. 746 F.3d 1112, 1114 (9th Cir. 2014). The suspect led police on a high-speed chase, and repeatedly said that he wanted to kill himself or have police kill him. Id. After the chase ended, the suspect "picked up a big rock that he smashed against his forehead three or four times, causing considerable bleeding," and then "attempted to pull a four-foot long metal pole out of the ground and impale himself on it." Id. The suspect then began walking towards two officers, "carrying a rock in his hand," and then "threw several softball sized rocks" at them, missing, but shattering the spotlight on their patrol car. The officers asked for assistance from any

United States District Court
Northern District of California

1  agency that could provide non-lethal assistance, and were told that a K-9 unit was on its

2  way.  The suspect then "began walking towards the patrol cars while continuing to throw

3  rocks," and as he approached two officers, "he held a large rock about the size of a

4  football above his head."  He refused to comply with an order to drop the rock, and

5  instead "kept advancing at an irregular pace, forcing the officers to back up."  One officer

6  warned "we are going to have to shoot you if you don't drop that rock," but the suspect

7  continued to advance, and when he came "within a few feet" of the officers, they both

8  fired.

9          The court noted that it was undisputed that, at the time of the shooting, the

10  suspect was only one yard away from the officers and was holding a football-sized rock

11  over his head.  And in light of his prior actions – "the high speed chase, hitting himself

12  with a stone, throwing rocks at the officers – the officers reasonably believed that Lal

13  would heave the rock at them." Id. at 1117.

14          In each of these cases, the suspect either directly attacked an officer, or

15  brandished some sort of weapon directly at the officers.  Although the "weapons" in

16  Garcia (a stick and a rock) and Lal (a rock) were less dangerous than the perceived

17  AK-47 carried by Andy, they were still used to directly threaten an officer before deadly

18  force was used.  Defendants cannot point to any similarly-threatening behavior on Andy's

19  part.

20          Defendants argue that, even if hindsight shows that Andy did not actually pose a

21  threat, it was still reasonable for Gelhaus to believe that he posed a threat at the time of

22  the shooting.  For support, defendants cite to the Ninth Circuit's decision in Blanford v.

23  Sacramento County, 406 F.3d 1110 (9th Cir. 2005).

24          In Blanford, police responded to a call regarding a man carrying a sword and

25  "behaving erratically."  406 F.3d at 1112.  Officers told the suspect to drop the sword, but

26  he did not comply (though later it was learned that he was wearing headphones, and thus

27  could not hear the officers' command), and instead "raised the sword and growled."  The

28  suspect then moved towards a private residence (which turned out to be his parents'

1    house), attempted to open the front door, and then started to go around the house

2    towards a back gate.  At that point, officers believed that he "posed an immediate and

3    unacceptable risk of harming whoever was in the house or yard should he be allowed to

4    escape beyond the gate," and fired upon him.

5         While Blanford, like the present case, arguably involves no direct threat to the

6    officers (depending on the circumstances behind the raising of the sword and the

7    "growling"), it does involve a report of "erratic" behavior, as well as a potential threat to

8    others by attempting to enter the back gate of a house while carrying a sword.  The only

9    similarity between this case and Blanford is that, in hindsight, neither suspect posed an

10   actual threat.  But unlike the suspect in Blanford, there were no reports of Andy acting

11   erratically.  Nor was Andy attempting to enter a private home, which could have made it

12   reasonable to believe that he posed a threat to those inside.  Thus, there is no basis for

13   applying Blanford to this case.

14        Beyond the above-mentioned Ninth Circuit cases, defendants cite to unpublished

15   Ninth Circuit cases, as well as cases from outside of this circuit, in support of their

16   argument that the suspect need not possess an actual weapon in order to pose a threat

17   justifying deadly force.  Indeed, a number of the cited cases involve objects that were

18   mistaken for guns or other weapons.  In Bowles v. City of Porterville (an unpublished

19   Ninth Circuit case), the suspect "pivoted and pointed a metallic object," which turned out

20   to be a cologne bottle, at an officer.  571 Fed. Appx. 538 (9th Cir. 2014).  In Penley v.

21   Eslinger, an Eleventh Circuit case, a fifteen-year-old boy had a plastic gun that was

22   modified to look like a real gun, and pointed it at officers at least three times before being

23   shot.  605 F.3d 843 (11th Cir. 2010).  Finally, in Bell v. City of East Cleveland, an

24   unpublished Sixth Circuit case described by defendants as being "directly on point," a boy

25   around the age of 14 pointed a BB gun at an officer before being shot, and the court

26   specifically noted that "he was pointing the gun at Officer Rodgers when Officer Rodgers

27   shot him."  125 F.3d 855 (6th Cir. 1997).  Though defendants are correct that a suspect

28   need not possess an actual weapon in order to make a threat justifying the use of deadly

8

force, defendants must still establish that it was reasonable to believe that Andy posed a "significant threat" in order to obtain summary judgment, and these three cases provide no basis for finding such a threat in the absence of a suspect pointing a perceived weapon at officers.

Defendants do cite one case in which no weapon, real or perceived, was pointed at officers, and at the hearing, they urged that the court follow that decision. See Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001). In Anderson, two police officers were providing security at a shopping mall, and were told by a patron about a man (Anderson) who appeared to have a gun under his sweater. The officers observed Anderson, saw a bulge near his waistband, and believed it to be a gun. Unbeknownst to the officers, the bulge was actually a Walkman radio, which Anderson was listening to with headphones that were covered by a hat.

When Anderson exited the mall, the officers approached him with guns drawn and instructed him to raise his hands. While Anderson initially complied with the order, he then lowered them without explanation to the officers, attempting to turn off his Walkman. Believing that he was reaching for the reported weapon, one of the officers (Russell) opened fire.

At trial, the jury found that the officers had used excessive force, and that the officers were not entitled to qualified immunity. The officers then moved for judgment as a matter of law, which the district court granted as to qualified immunity, but denied as to the excessive force claim, finding that "the evidence is much, much too conflicting on whether, in fact, the circumstances presented as a matter of law made the use of force constitutional." 247 F.3d at 128-29 (internal citation omitted). The Fourth Circuit affirmed the entry of judgment in the officers' favor, but did so on different grounds than the district court, finding that there was no "legally sufficient evidentiary basis for a rational jury to find for [plaintiff] on the issue of excessive force." Id. at 130. The court emphasized that, immediately before the officer fired, the suspect "was reaching toward what Russell believed to be a gun," and that "[a]ny reasonable officer in Russell's position would have

1   imminently feared for his safety and the safety of others." Id. at 131.  The court further

2   noted that "an officer does not have to wait until a gun is pointed at the officer before the

3   officer is entitled to take action."  Id.

4        While Anderson provides stronger support for defendants' position than any of the

5   other cited cases, the court declines to follow it in the present case for at least two

6   reasons.  First, while the court does not question the ultimate result reached by the

7   Anderson court, it does question the basis for holding that "because Russell had sound

8   reason to believe that Anderson was armed, Russell acted reasonably by firing on

9   Anderson as a protective measure before directly observing a deadly weapon."  247 F.3d

10   at 131.  The Ninth Circuit has held that the mere possession of a weapon is not sufficient

11   to justify the use of deadly force, "otherwise, that a person was armed would always end

12   the inquiry."  Glenn v. Washington County, 673 F.3d 864, 872 (9th Cir. 2011).  In fact, the

13   Ninth Circuit in Washington criticized the district court for adopting reasoning similar to

14   the Fourth Circuit in Anderson – with the Ninth Circuit stating that the "district court

15   mischaracterized our case law as establishing that 'when a suspect was armed with a

16   deadly weapon, the officers' use of force was reasonable as a matter of law.'"  673 F.3d

17   at 872-73.  The Washington court then cited a number of the cases discussed above

18   (including Blanford and Scott), noting that, in each case, the court "engaged in a context-

19   specific analysis rather than resting our holding on the single fact that the suspect was

20   armed."  Id. at 873.

21        This "context-specific analysis" provides the second reason for distinguishing

22   Anderson from the present case.  In an unpublished case cited by defendants, the Sixth

23   Circuit attempted to articulate a method for applying the required "context-specific

24   analysis."  The court reviewed a number of police-shooting cases in which summary

25   judgment was granted (including Anderson and Bell), and found that, in each case, "the

26   operative fact was a suspect either pointing a weapon at an officer, 'coming at' an officer,

27   or making a sudden movement that an officer reasonably perceived as reaching for a

28   weapon."  Edgerson v. Matatall, 529 Fed. Appx. 493, 498 n.1 (6th Cir. 2013).  Indeed,

10

United States District Court
Northern District of California

1    while Anderson did not involve a suspect pointing a weapon at an officer or otherwise

2    "coming at" him, it did involve a "sudden movement that an officer reasonably perceived

3    as reaching for a weapon," while in the present case, Andy was already holding a

4    weapon pointed down at his side, and merely turned around in response to an officer's

5    command, with no "sudden movement" towards the weapon.

6         While defendants cite testimony that the barrel of Andy's gun "began" to come up,

7    or was "in the process" of being pointed at the deputies, the court is obligated to view that

8    evidence in a light most favorable to the non-moving parties.  And in that light, the court

9    can conclude only that the rifle barrel was beginning to rise; and given that it started in a

10   position where it was pointed down at the ground, it could have been raised to a slightly-

11   higher level without posing any threat to the officers.  In contrast, each of the cases cited

12   by defendants involves a suspect who either (1) physically assaulted an officer, (2)

13   pointed a weapon (or an object believed to be a weapon) at officers or at others, (3)

14   made a sudden movement towards what officers believed to be a weapon, or (4)

15   exhibited some other threatening, aggressive, or erratic behavior.  Because this case

16   involves none of those facts, defendants have not shown that summary judgment is

17   warranted, as there remains a triable issue of fact as to whether defendant Gelhaus' use

18   of deadly force was reasonable.  While the court is certainly mindful of the fact that

19   "police officers are often forced to make split-second judgments – in circumstances that

20   are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in

21   a particular situation," (Graham, 490 U.S. at 396-97), in this case, the court finds that the

22   question of reasonableness is best resolved by a jury, not by the court on summary

23   judgment.

24        Defendants separately argue that the doctrine of qualified immunity warrants

25   summary judgment on plaintiff's first cause of action.  The defense of qualified immunity

26   protects "government officials . . . from liability for civil damages insofar as their conduct

27   does not violate clearly established statutory or constitutional rights of which a

28   reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

United States District Court
Northern District of California

1    The rule of qualified immunity "provides ample protection to all but the plainly

2    incompetent or those who knowingly violate the law"; defendants can have a reasonable,

3    but mistaken, belief about the facts or about what the law requires in any given situation.

4    Malley v. Briggs, 475 U.S. 335, 342 (1986).  "Therefore, regardless of whether the

5    constitutional violation occurred, the [official] should prevail if the right asserted by the

6    plaintiff was not 'clearly established' or the [official] could have reasonably believed that

7    his particular conduct was lawful."  Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.

8    1991).  Qualified immunity is particularly amenable to summary judgment adjudication.

9    Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004).

10       A court considering a claim of qualified immunity must determine whether the

11   plaintiff has alleged the deprivation of an actual constitutional right and whether such right

12   was clearly established such that it would be clear to a reasonable officer that his conduct

13   was unlawful in the situation he confronted.  See Pearson v. Callahan, 555 U.S. 225,

14   235-36 (2009) (overruling the sequence of the two-part test that required determination of

15   a deprivation first and then whether such right was clearly established, as required by

16   Saucier v. Katz, 533 U.S. 194 (2001)).  The court may exercise its discretion in deciding

17   which prong to address first, in light of the particular circumstances of each case.  Id.

18   (noting that while the Saucier sequence is often appropriate and beneficial, it is no longer

19   mandatory).

20       Regarding the first prong, the threshold question must be: Taken in the light most

21   favorable to the party asserting the injury, do the facts alleged show that the defendant's

22   conduct violated a constitutional right?  Saucier, 533 U.S. at 201; see Martin, 360 F.3d at

23   1082 (in performing the initial inquiry, court is obligated to accept plaintiff's facts as

24   alleged, but not necessarily his application of law to the facts; the issue is not whether a

25   claim is stated for a violation of plaintiff's constitutional rights, but rather whether the

26   defendants actually violated a constitutional right).  "If no constitutional right would have

27   been violated were the allegations established, there is no necessity for further inquiries

28   concerning qualified immunity."  Saucier, 533 U.S. at 201.

United States District Court
Northern District of California

1    The inquiry of whether a constitutional right was clearly established must be

2    undertaken in light of the specific context of the case, not as a broad general proposition.

3    Saucier, 533 U.S. at 202.  The relevant, dispositive inquiry in determining whether a right

4    is clearly established is whether it would be clear to a reasonable defendant that his

5    conduct was unlawful in the situation he confronted.  Id.; see, e.g., Pearson, 555 U.S. at

6    243-44 (concluding that officers were entitled to qualified immunity because their conduct

7    was not clearly established as unconstitutional as the "consent-once-removed" doctrine,

8    upon which the officers relied, had been generally accepted by the lower courts even

9    though not yet ruled upon by their own federal circuit).  If the law did not put the

10   defendant on notice that his conduct would be clearly unlawful, summary judgment based

11   on qualified immunity is appropriate.  Saucier, 533 U.S. at 202.

12   "If there are genuine issues of material fact in issue relating to the historical facts

13   of what the official knew or what he did, it is clear that these are questions of fact for the

14   jury to determine."  Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099

15   (9th Cir. 1995).  If the essential facts are undisputed, or no reasonable juror could find

16   otherwise, however, then the question of qualified immunity is appropriately one for the

17   court.  Id. at 1100 (citing Hunter v. Bryant, 502 U.S. 224, 227-28 (1991)).  Or the court

18   may grant qualified immunity by viewing all of the facts most favorably to plaintiff and

19   then finding that under those facts the defendants could reasonably believe they were not

20   violating the law.  See, e.g., Marquez v. Gutierrez, 322 F.3d 689, 692-93 (9th Cir. 2003);

21   Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1051-53 (9th Cir. 2002).

22   During the pendency of this motion, the Supreme Court issued another opinion

23   explaining how to determine whether a constitutional right is "clearly established."  See

24   Mullenix v. Luna, 136 S.Ct. 305 (2015).  In Mullenix, two police officers were involved in a

25   high-speed car chase of a suspect.  During the chase, the suspect called the police

26   dispatcher, claiming to have a gun and threatening to shoot the officers if they did not

27   abandon the chase.  As the two officers continued the chase, other officers set up tire

28   spikes at three locations.  Another officer (Mullenix) was poised to set up a fourth spike

United States District Court
Northern District of California

1  strip, but then decided to take another tactic – shooting at the suspect's car from a

2  vantage point on a highway overpass.  As the suspect approached the overpass,

3  Mullenix fired six shots, killing the suspect.

4  The suspect's estate brought suit against Mullenix under section 1983, and

5  Mullenix moved for summary judgment based on qualified immunity.  The district court

6  denied the motion, and the Fifth Circuit affirmed, holding that Mullenix was not entitled to

7  qualified immunity because "the law was clearly established such that a reasonable

8  officer would have known that the use of deadly force, absent a sufficiently substantial

9  and immediate threat, violated the Fourth Amendment."  773 F.3d 725.

10  The Supreme Court found that the Fifth Circuit's statement of "clearly established"

11  law was too general, and did not take into account the specific context of the case.

12  Rather than asking the broad, generalized question of whether an officer may use deadly

13  force "against a fleeing felon who does not pose a sufficient threat of harm to the officer

14  or others," the relevant inquiry must account for the specific factual circumstance

15  confronted by the officer.  The Court then seemingly re-framed the question, asking

16  whether it was clearly established that the officer acted unreasonably when he

17  "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed

18  vehicular flight, who twice during his flight had threatened to shoot police officers, and

19  who was moments away from encountering an officer."  Id. at 309.  Applying that test, the

20  Court reversed the Fifth Circuit's determination that Mullenix was not entitled to qualified

21  immunity.

22  As applied to this case, the court agrees that a conclusory formulation of the

23  qualified immunity question – such as asking whether it was clearly established that it is

24  unreasonable to use deadly force on a suspect who does not pose a significant threat –

25  strips the qualified immunity doctrine of all meaning.  Thus, taking into account the

26  specific context of the case and the specific circumstances faced by defendants, the

27  relevant question is whether the law was clearly established such that an officer would

28  know that the use of deadly force is unreasonable where the suspect appears to be

14

United States District Court
Northern District of California

1  carrying an AK-47[2], but where officers have received no reports of the suspect using the

2  weapon or expressing an intention to use the weapon, where the suspect does not point

3  the weapon at the officers or otherwise threaten them with it, where the suspect does not

4  "come at" the officers or make any sudden movements towards the officers, and where

5  there are no reports of erratic, aggressive, or threatening behavior.  Based on the review

6  of the cases above, the court finds that it was clearly established, and thus, qualified

7  immunity does not shield Gelhaus from liability.  Accordingly, defendants' motion for

8  summary judgment as to the first cause of action is DENIED.

9      As mentioned above, plaintiffs have conceded that summary judgment is

10  warranted as to the second cause of action, and also warranted as to the third cause of

11  action to the extent asserted against Sonoma County.  Thus, the court will address the

12  remainder of the third cause of action, a substantive due process claim under section

13  1983 asserted against defendant Gelhaus.

14      In their motion, defendants cited Ninth Circuit authority holding that Fourteenth

15  Amendment due process claims are subject to a higher standard than Fourth

16  Amendment excessive force claims, and that only conduct that "shocks the conscience"

17  is cognizable as a due process violation.  Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir.

18  2008); see also County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  In

19  determining whether a use of force shocks the conscience, "a court must first ask

20  whether the circumstances are such that actual deliberation by the officer is practical."

21  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).  If deliberation is practical, then an

22  officer's "deliberate indifference" may be sufficient to shock the conscience.  Id.  If

23  deliberation is impractical, however, then the officer's conduct "may only be found to

24  shock the conscience if he acts with a purpose to harm unrelated to legitimate law

25  enforcement objectives."  Id.; see also Gonzalez v. City of Anaheim, 747 F.3d 789, 797-

26

27  _____

28  [2] As before, the court need not reach the issue of whether it was reasonable for the officers to believe that the toy rifle carried by Andy was an actual AK-47, because even assuming the reasonableness of that belief, qualified immunity is still not warranted.

1   98 (9th Cir. 2014).

2        Plaintiffs' opposition did not address the "shocks the conscience" standard, and

3   thus did not address the issue of whether defendant Gelhaus had time to deliberate

4   before shooting.  Defendants presented evidence that only twenty seconds elapsed

5   between the initial siren chirp and the shots being fired, and plaintiffs did not present any

6   competing evidence.  At the hearing, plaintiffs addressed the "deliberation" question for

7   the first time, suggesting that, because the other officer on the scene (Schemmel) did not

8   fire his weapon, defendant Gelhaus must have had time to deliberate.

9        Based on the evidence presented, the court finds that defendant Gelhaus did not

10  have time to deliberate, and thus, the "purpose to harm" standard applies.  The Ninth

11  Circuit has previously held that even a five-minute encounter can trigger that higher

12  standard, if it involves a "quickly evolving and escalating" situation requiring "repeated

13  split-second decisions."  Porter, 546 F.3d at 1139.  In fact, in the seminal case that set

14  forth the distinction between situations where there was time to deliberate and those

15  where deliberation was not possible, the Supreme Court used a custodial prison situation

16  as the prime example of a scenario where officials would have time to deliberate,

17  contrasting it to a police chase requiring split-second judgment.  See Lewis, 523 U.S. at

18  852-54.  The Court reasoned that, in a custodial prison situation, it made sense to apply a

19  lower standard of liability, based on the "luxury enjoyed by prison officials of having time

20  to make unhurried judgments, upon the chance for repeated reflection, largely

21  uncomplicated by the pulls of competing obligations."  Id. at 853.

22        In this case, the court finds that the officers did not have time for "repeated

23  reflection," as even plaintiffs' own complaint alleges that "[f]rom the time that the deputies

24  called out to Andy Lopez until the time that Gelhaus fired his first shot, only three

25  seconds elapsed."  SAC, ¶ 37.  Even assuming that deputy Schemmel also had his gun

26  drawn and made the decision not to fire, the fact that Schemmel made a different split-

27  second decision than Gelhaus does not mean that either deputy had time to deliberate.

28  Thus, the court finds that the "purpose to harm" standard must apply.

16

1    The next question then becomes whether plaintiffs have raised a triable issue of

2    fact as to whether defendant Gelhaus acted "with a purpose to harm unrelated to

3    legitimate law enforcement objectives."  The Ninth Circuit has explained that such a

4    purpose may be found where, for example, "an officer uses force to bully a suspect or

5    'get even.'"  Wilkinson, 610 F.3d at 554.

6    In this case, plaintiffs have presented no evidence that defendant Gelhaus acted

7    with a purpose "unrelated to legitimate law enforcement objectives."  In fact, plaintiffs'

8    own opposition brief notes that Gelhaus testified that he did not know Andy prior to the

9    shooting.  Dkt. 76 at 3.  In the absence of any evidence that Gelhaus acted with a

10   purpose to harm that was unrelated to law enforcement objectives, the court finds that

11   summary judgment must be GRANTED as to plaintiffs' third cause of action, to the extent

12   asserted against defendant Gelhaus.

13   Turning to plaintiffs' fourth cause of action, a state-law wrongful death claim

14   against defendants Gelhaus and Sonoma County, the central dispute between the parties

15   revolves around the applicable legal standard.  In their motion, defendants argue that the

16   same "reasonableness" standard applicable to the federal Fourth Amendment claim

17   (brought under section 1983) also applies to the state law claim.  Plaintiffs' opposition

18   argues that the state law claim is governed by a different, broader standard that takes

19   into account the totality of the circumstances, as opposed to the federal law's more

20   narrow focus on the moment when deadly force is used.

21   Despite this dispute, the parties appear to agree that, if summary judgment is

22   denied as to the Fourth Amendment claim (under the "reasonableness" standard), then it

23   should also be denied as to the state law claim.  Indeed, any difference between the two

24   standards comes into play only if summary judgment were to be granted as to the Fourth

25   Amendment claim, with plaintiffs maintaining that they would still have a viable state law

26   claim.  Because the court has denied summary judgment under the Fourth Amendment's

27   "reasonableness" standard, it need not reach the issue of which standard applies to the

28   state law claim.  Defendants' motion for summary judgment as to the fourth cause of

United States District Court
Northern District of California

17

1   action is thus DENIED.

2        Finally, plaintiffs' fifth cause of action is styled as a "survivorship" claim asserted

3   by the Estate of Andy Lopez.  "In a survival action, a decedent's estate may recover

4   damages on behalf of the decedent for injuries that the decedent has sustained."  Davis

5   v. Bender Shipbuilding & Repair Co., 27 F.3d 426, 429 (9th Cir. 1994).  In contrast, a

6   wrongful death claim (such as the fourth cause of action) must be brought by the

7   decedent's dependents, and is limited to "claims for personal injuries they have suffered

8   as a result of a wrongful death."  Id.

9        The practical effect of this distinction is that a survival action, unlike a wrongful

10  death action, allows for recovery of damages suffered by the decedent himself, including

11  those suffered before his death.  The Ninth Circuit has recently clarified that a survival

12  action allows recovery of non-economic damages, including pain and suffering, under

13  section 1983, despite California's disallowance of such damages.  See Chaudhry v. City

14  of Los Angeles, 751 F.3d 1096, 1103 (9th Cir. 2014).

15       However, a survival action is not an independent cause of action, it is a procedural

16  vehicle to ensure that "a cause of action for or against a person is not lost by reason of

17  the person's death, but survives subject to the applicable limitations period."  Cal. Civ.

18  Proc. § 337.20.  In other words, pursuant to California's survivorship statute, when Andy

19  died, his right to assert a Fourth Amendment excessive force claim survived his death

20  and may be asserted by his estate.  In this case, the practical effect of the survivorship

21  statute is to allow the Estate of Andy Lopez to assert Andy's Fourth Amendment

22  excessive force claim, which is accomplished by the first cause of action.  That claim

23  stands in contrast to the fourth cause of action, which is a wrongful death claim brought

24  by Andy's parents, and seeks damages for the harm suffered by Andy's parents, not the

25  harm suffered by Andy.

26       Because the first cause of action already provides a mechanism to seek damages

27  for the harm suffered by Andy, including pre-death pain and suffering, the fifth cause of

28  action is duplicative.  For that reason, defendants' motion for summary judgment as to

18

1   the fifth cause of action is GRANTED.

2                                    **CONCLUSION**

3          For the foregoing reasons, defendants' motion for summary judgment is

4   GRANTED in part and DENIED in part.  As to the first cause of action, the motion is

5   DENIED.  As to the second cause of action, the motion is GRANTED.  As to the third

6   cause of action, the motion is GRANTED as to Sonoma County, and also GRANTED as

7   to defendant Gelhaus.  As to the fourth cause of action, the motion is DENIED.  As to the

8   fifth cause of action, the motion is GRANTED.

9          On October 5, 2015, the court approved the parties' stipulation to forego a second

10  settlement conference and to instead participate in private mediation no later than

11  December 1, 2015.  The docket does not indicate whether the mediation has been

12  concluded.  Accordingly, in light of this order ruling on dispositive motions, and given the

13  April 11, 2016 trial date, the parties shall participate in a further mediation session before

14  March 17, 2016.  Or, if they prefer, the court will re-refer the case to Magistrate Judge

15  Ryu for a further settlement conference.  The parties shall advise the court of their

16  decision no later than **January 27, 2016**.

17         **IT IS SO ORDERED.**

18  Dated:  January 20, 2016

19                                          _____

20                                          PHYLLIS J. HAMILTON
                                            United States District Judge

21

22

23

24

25

26

27

28